McAlpin v. Town of Sneads, Fla., Ms. Maddox. Your Honor, may it please the court. My name is Marie Maddox on behalf of the appellant, and we are here before the court asking that the order granting summary judgment on all three counts be reversed. And I wanted to walk through and I'll rely upon our brief for any matters that I don't address. But first start with the whistleblower and talk about the law. The court found that and interpreted 112-3187 very restrictively and did not acknowledge that under 112-3187 that you don't have to have just a writing, it can also be and there are a host of cases that we've cited in our brief, that it can be a troubleshooting meeting, it can be an inquiry. One of the problems I had with your brief, Ms. Maddox, was that I can't understand. So one of the things you argue is that your client was justified in his decision not to cut back on police department overtime and compensatory time and that he was planning on returning the truck eventually. It's just kind of, I don't understand the relevance of those. The second, the truck, the issue was... The fact is, if he didn't return it, whether he had an intent to eventually or not, if he didn't, it seems like insubordination to me. Yes, sir. And I understand, but Judge, he was, when he was originally asked to return the truck, he was out of town. He ended up returning the truck and had someone come over to his home to actually get the truck. So that was only one of the... And had the keys returned to him. The keys were ultimately returned to the city. Ultimately. Yes, sir. And the city, he was not home at the time that the truck, that she had originally asked for the truck. He was not even home at the time that she was asking for it. He had been out of town. So when he returned to town, the truck got returned to them. And so there was no issue. But without keys. Originally without keys. And then he then gave the keys to them. But I think the court needs to look at the reason that the court, that they were even asking for the truck to begin with. My concern, Ms. Maddox, is it seems to me that these kinds of things and him basically ignoring the counsel in terms of overtime is enough for them to reasonably believe that he had been insubordinate. Your Honor, I would respectfully disagree. And let me talk about the overtime. Ms. Maddox, before you do that, are you denying any insubordination? Judge, I think it could be reasonably interpreted by the council that there was a delay in returning the truck. I'm not talking about the truck. I'm talking about the entire factual scenario here. Your guy at a meeting on August 9th of 2018 responded to the council about requests for solutions that the only solution he had was to not hire a city manager who was sitting there and for the council to forfeit their salaries each month. Well, not in subordination. No, sir, it isn't because you've got to understand the frustration that Mr. McAlpin had as the chief of police. What she was directing, Lynda Bell was directing, was that he not incur any additional overtime or combat. Right. He couldn't do that because that was a safety issue. He didn't have coverage as law enforcement for the city of Sneed. As I understand it, though, the county, the council's position was the county could pick up the slack. And they had not picked up the slack for years. And that's the reason that Mr. McAlpin needed to still... I mean, look, they can only incur expenses when they have money for it. The problem is they had incurred those expenses for years. Maybe so, but if they're short of the money and they say don't incur the expenses and he does it anyway, it sounds like insubordination to me. Well, you know, if you look at the Facebook post that he made and he talked about the safety of the citizens in Sneed's and the fact that you've got a law enforcement department that is there in Sneed's that cannot provide... Because what he was essentially being directed to do was take law enforcement officers off the street. His responsibility as the chief of police was to provide the law enforcement service. And he says, how am I going to do this? May I ask a question about the Facebook post? When he made the Facebook post, was he... Is it your position that he was posting that as a citizen or as the chief of police in his role as chief of police? As a citizen, but it could also have been, it was not part of his job duties. And so it could be covered under either the First Amendment or it could be covered as a whistleblower, either one. And so it's a writing. But let me go back and address if I could, and I don't have a lot of time, but the insubordination. If you look overall at the 12 years that Mr. McAlpin had been working for the city, you have a new city manager who comes in and starts making directions to him that under the city charter, according to Mr. Green and just a plain reading of the city charter, she has no authority over him whatsoever. So you have Linda Bell, who was giving him directives to say, do this and do that, when she was not in a supervisory position over him. And Mr. Green, as a matter of fact, Guy Green, the lawyer for the city, after he had even expressed his opinion that the city council could not vote to put her over Mr. McAlpin, he himself was fired. So if you go back and look at the history and don't, you know, don't take one thing out because another thing that he was accused of, Mr. McAlpin, accused of being insubordinate, was buying coffee creamer and, you know, making expenditures that were not authorized. Well, we were successful in proving that and have record evidence that he was not the one who had ordered the coffee creamer, etc. So, you know, to look at the bigger picture as to what happened, and let me go back and just talk about the whistleblower statute, and the narrow interpretation by the court. There were seven different disclosures that we have identified, and the court, in contrast to 112.3187, had limited the disclosures, finding that the disclosures either were oral, and you can make oral disclosures under 112.3187 subsection 7. It requires a written and signed complaint. No, sir, it does not. That is only one part of 112.3187, and the court said that, and narrowly interpreted the statute, in contrast to the case. You mean it followed the language of the statute? I mean, where does it say it can be orally? This section, I'm reading under subsection 7. This section protects employees and persons who disclose information on their own initiative. Number one, it doesn't have the one, but I've numbered these, and a written and signed complaint. Right. Second, there's a semicolon, who are requested to participate in an investigation, hearing, or other inquiry conducted by an agency or federal government entity. So, there's no writing requirement with regard to the second one, and there are a host of cases that have been decided under Florida law that talk about that. The Edenfield case, the Shook case, there are cases that we've cited in our brief, the Jones v. School Board of Orange County, Florida. Ms. Mattis, we've read your brief, and we know that your brief repeatedly uses the term troubleshooting meeting. Where can you find that language in the whistleblower statute? Judge, it's not in the whistleblowing statute itself, but if you read the plain language of the whistleblower statute, it says that employees who are requested to participate in an investigation, hearing, or other inquiry conducted by an agency or federal governmental entity. I get that, but in what meeting was he requested to participate in? He wasn't. He has, there are, the fourth disclosure, and this was on July 2nd, 2018, Mr. Pettis came to Mr. McAlpin's office and began to question him about the Allen disciplinary file. And when he questioned him about that, and this is all in the record, and he disclosed to him that it was illegal for the council to have voted to have taken Mr. Allen's disciplinary records out of the file, that that was a violation of 112, I'm sorry, 119, the public record. My question is, when was he invited into an investigation? Well, Mr. Pettis came to him and questioned him about the, and that would be the inquiry under the statute, that you have an inquiry conducted by an agency or federal governmental entity. And because of the breadth of the statute, and that's what has been lost in all of this, is that Irvin, the Florida Supreme Court said that this statute could not have been more broadly worded. And there are other cases that have also interpreted and said that the statute must be given a liberal construction. So with that backdrop, and you see that you're given a liberal construction and you read the cases that have been decided under Florida law, and no, Your Honor, it doesn't say the word troubleshooting is not in the statute, but the way that the courts have So if you look at the history of the Florida whistleblower statute, and look at the breadth, and what the Florida Supreme Court... I thought when Pettis met with McAlpin, they met to discuss schedule changes to avoid accrual of comp and overtime. No sir, not on the fourth disclosure, they had also talked about that as well, but they also talked when Pettis came to Mr. McAlpin's office to talk about Mr. Allen's personnel file. And that's when Mr. McAlpin told him and said, no, you can't do this, this is a violation of chapter 119. I see that my time has expired and I will reserve the rest of my time. Okay, you have four minutes you've reserved. Mr. Siegel. Thank you, Judge. May it please the court. I'm Scott Siegel and I represent the appellees, the town of Sneeds, and the individual defendants in this action. I don't care what y'all do about the budget. All I care about is the police department, and I haven't done anything about the budget. I'll tell you what you can do. Y'all can give up y'all's checks and maybe that'll help the budget. Your Honor, those shocking and disrespectful words are not mine. Those are plainest words to the city council at its meeting on August 9 2018 as it pled with him yet again to help it find a way to solve an ongoing budget crisis a crisis called a question. I'm interested in the Facebook post. Let's assume that that that qualified as a matter of public concern made by a private citizen. Even if that was the case, would did the city sufficiently show that there was another reason to terminate him that didn't have to do with him posting. Numerous reasons judge and let me address the Facebook post first, even when she just started your oral argument with as I understand it, that would be primary judge the inability to work with the council to solve an ongoing crisis the council must have the ability to work with this police chief judge even if we assume that Facebook post is protected, meaning it was made in his capacity as a citizen and address issues of public concern, which you have to next look at is who knew about it. The evidence is is that Lewis was the only member of the council who knew about the Facebook post to begin with, there's no evidence that any of the others rise for the others even had Facebook much less they knew about it. And so that could not have motivated a majority of the members of the council to retaliate him because of the Facebook post. So I think that there's another level there that my other question is, I mean I looked at the record is I, is there any record evidence that shows, or has he did Mr. Did he show anything that it was pretext, I mean I didn't see anything in the record. No, he could not show that it's pretext. This record is replete with undisputed evidence of numerous hostile disrespectful and openly insubordinate actions that no employer could or would be expected to tolerate in its workforce. This of course culminated just days before its termination with the town had to pay hundreds of dollars during a budget crisis to hire a locksmith to gain access to its own truck, because after the because the plaintiff had again refused to obey repeated direct orders to return the keys that office keys that we needed because they had refused numerous direct orders to allow the inspection of certain records for their potential responsiveness to a public records request. Just these egregious acts which are occurring just days before the vote for the termination or not remotely the extent of the insubordination. We have the continuing to spend money in violation of the direct order of the town council. Now Miss Maddox says oh it's just all things it's coffee creamers. Well, remember, the context here is important at the August 2 meeting, the council learned that it was $21,000 over budget that had no cash flow at all. And that was going to have to borrow money to make ends meet, and the council directed that there was going to be no more spending in any department by anybody without the council presidents direct personal approval. And he ignores this release his department or the department under his control just flatly ignores this, and he wants to say well judge this is, these are small things. I think that makes it worse the fact that you're violating just openly this order to buy unnecessary inconsequential items because, hey, I think we really need more coffee in the police department. His refusal to provide logs that the town manager had requested. These are dispatch logs and police activity logs she was trying to look into this allegation that comp time and overtime was unavoidable okay let's see what your officers are actually doing let's see who's actually doing what's going on here. He refuses to provide those records to her he never provides those records to her. The continual accrual of comp time and overtime. This is an issue that had been going on for years judge in 2017 with the new council members are coming on to the council chief refused to make any changes in the way his department was operated. There were multiple suggestions here hey, can we go to 12 hour shifts can we use more part time employees, can we transfer positions to the county that we don't need. He refused to do any of those things and just to say, hey, comp time and overtime is absolutely unavoidable and that's certainly not the case if you're willing to to work with the council to make changes to restructure the problem. What had been going on there for years, wasn't working. The town was in dire straits financially, it needed its police chief to work with it to cooperate with it to find solutions and that's why I called the chief into this meeting on August 9. And, you know, if you look at that meeting again context is important. President Grice brings up again transferring the dispatch position and he says I'm totally against it I'll fight it at the end, I will not agree to this, I will not accept this is what he tells them. So Grice asked him about switching to 12 hour shifts. He ignores her. He refuses to even respond to that question. And so Johnson reminds him, Councilman Johnson says, hey, you guys were instructed the last meeting to come to this meeting to offer some solutions to help with this. And that is when he tells them, I don't care what you do about the budget, you can you can you can give up your own checks you can not hire the town manager, the town manager that the council obviously felt it needed to help wrangle these issues together and get it back on a track of financial stability. You know this budget crisis I think cannot be overlooked but if we count these up, you know, refusing to return the truck returning without the keys, refusing to provide keys to his own office forcing us to cut the lock off with the saws all refusing to cooperate with the town manager on on the request for records about comp time and overtime use the refusal to cooperate with her so that she could review the the public records request the town and how to respond to that just blatant continuing to accrue comp time and overtime. I will say this, you know, if he had come to her and say, you know, we had this extraordinary issue last night, where it was right at the end of one shift in this officer could not, you know, roll off shift and had to work a little bit of overtime I'm sorry I know you said you want that but it was unavoidable and the circumstance, you know, I gotta think that that's probably going to be okay. But that's not what happened. He just ignored the directive altogether and multiple employees continue to accrue multiple excessive amounts of comp time and she's emailing him 234 times, hey, what is going on here I've told you to stop this, and he and she's asked for these records so that she can double check into this, and he ignores her he refuses to cooperate with her. I want to take a moment to address the idea that he could ignore her that he didn't have to respond to the town manager, because that is not at all what this record supports. I think, Miss Maddox accurately quotes the town charter, but the plan just doesn't understand I think the concept of delegation of authority by ordinance in 1994 the council created the position of town manager and made that town manager the chief executive officer and head of the administrative branch and delegated to her authority over all administrative affairs of the town, except the power to appoint and remove the chief of police and others. So except for the ability to point and remove, she's otherwise in charge of all administrative issues in the town, especially as they relate to issues of budget and finance. In 2011, the town further limited the town managers role but only in one very narrow way. The town manager was thereafter not allowed to hire and fire, lower level police department employees the police officers themselves. That's the only thing that was changed in 2011, and it's the only thing that's changing in 2018 when they're trying to restore more powers of the town manager, the only thing they're giving them back to her at this point in 2018 is the power to hire and fire, the lower level police department employees herself, so that she wanted to make a change in the dispatcher she could do that if she wanted to hire part time employees for the department, she could do that directly without going through him. I'm sorry budget. And so I think that the, it is unmistakable in the record, and those ordinances that did 1994 the 2011 the 2018 they are all in this record, you can see the changes that we had not arguing someone, where's that where's that noise coming from. We stopped the clock for a moment. I think it's another lawyer. I think it is to Anthony. Yes, chief, I do not see any audio coming from the other attorneys, with the exception of those that are currently arguing. Okay. All right. We'll start apologize, Mr Segal for the interruption just trying to clean that up. I think you heard it to seem like you were distracted by. I did judge, I'm not looking directly at you I couldn't couldn't tell exactly who who was speaking there but I appreciate. Yeah, go ahead. Judge, the question of mathematics was, do you deny that there's any insubordination at all. And of course, she can't, it's undisputed on the record. He doesn't even argue that he didn't engage in those insubordinate he's proud of them he's dismissive of them. Oh, it's only a little bit of money it wasn't a big deal that I can order. Oh, you didn't really need that truck did you you know I don't really have to return it to mine, or you don't really need those keys to that office it's my office. I, you know, I'd already made a decision on the public records. So you miss town manager who was the CEO and responsible for these types of things, don't have to worry about it you don't you don't need to look at it. overtime and comp time or unavoidable there's nothing more that can be done about. He doesn't deny the insubordination he's dismissive of them, and he was dismissive of them with the town council as well just started legal defense, which is not a legal You know, the the disrespectful line that I opened this argument with judge. I think it's extraordinary that he was allowed to work another day beyond that. And the fact that they gave him the patients, and it showed the patients with him all the way up through again cutting locks off doors and hiring locksmiths in a time of a budget crisis to gain access to the towns on property is just extraordinary. And I think that no reasonable jury here could find otherwise. I don't know that there's a lot more that the court needs me to say here I will say that if there are any questions about protected activity I would ask the court to pay special attention to who knew about any of it. Because if you really looked at the key questions of whether it was speech as a citizen or speech in his capacity as chief of police, like when he's called to a public meeting to answer questions about solving police department issues that's obviously his, his capacity of chief of police and ask also if it's a matter of public concern or private concern. In other words, are you talking about your own personal sick leave or vacation leave or your own personal desire to not have to be supervised somebody. You also have to add, well who knew about this. So, and I think across the board, there's very few instances where you can say a majority of the council knew about this, I know as Maddox was focusing a moment ago on the, you know, the personnel file issue where he raises it with Pettis. Well Pettis was the only one that knew for example that the plaintiff was involved with that situation at all nobody else knew that plaintiff had been the one to raise that with Pettis and Pettis raise it himself at the meeting and didn't say oh you know McAlpin came to me with this. And if you really looked and parse those out, I think you're going to find very very few, where you can say a majority of the council, even knew about them. So, so that it could have motivated them as a council to take a retaliatory act. Can I ask you a question please. Yes, sir. With respect to the Facebook post under the Florida act would that not have been to made to an appropriate local official and was that or is it simply just a Facebook post. Judge, I don't think the Facebook post is, I mean, a public distribution is not a disclosure I think to an appropriate local official this is not a complaint that he gave to the town manager, or gave to President Grice, he posted it on Facebook. The statute is broad but if we're going to start including anything and everything you post on social media, especially when there's no evidence that this council paid attention to social media was aware of it. I think we are really stepping beyond what the statute allows. Well I think in one of the briefs and maybe in yours, it said that to the to the council members were aware of that post. But would that satisfy the requirements of the Florida act. Judge, I don't think so I don't think that's, I still don't think it's a disclosure to an appropriate public official, the fact that a public official may become aware of it on their own I don't think qualifies. You remember this requires a written and signed complaint emails can qualify that if you email your supervisors, I don't think there's any case anywhere in Florida law that says if I make a post on social media broadly, and, and some public officials later become aware of that post that that would be a an appropriate disclosure. I do think my notes here say that it was just Louis if you're sure there's there's another one that then that may be true judge, that's still only two, and remember the requirement here is that there has to be proof that a majority of the council acted with the shared retaliatory motive. And so even to would not be sufficient. In conclusion, the, this record is replete with undisputed evidence of planets lack of cooperation disrespectful attitude and objective and subordination. He didn't have to like the new members of the town council, but he had to find a way to work with them. He could not be openly refused, and the council had had enough. And I don't think there's any other conclusion on this record. Thank you judges. Thank you. Miss Maddox you've saved four minutes. It's Maddox, you are muted. I'm terribly sorry. I'm at the risk of beating a dead horse I hear what the poor saying, but the question is, under the law, whether there are genuine issues of fact that are evidence, so that such that a reasonable jury could return a verdict in Mr. McAlpin's favor. You hear one side of the story here, but to look at Mr McAlpin's motivation, for example, the keys. And let's talk about that just for a minute because there was evidence that was located in his office he kept the evidence there. So, he was concerned about compromising criminal investigations by giving them the keys so that he would have the keys to his office. Okay, that's number one. I mean this Maddox your argument seems to be he had good reasons to be in support. Well, no, sir. What I'm saying is that, that, why would those reasons, not be sufficient don't they cast doubt as to the reasons that are offered by the defendant, I don't see how I mean it seems to me that the question is for the employer, because the employer have an objective basis for saying that he was in support of, and it's your burden to prove that that in fact was not the reason, as opposed to that being that conduct being justified. That's a different inquiry. Yes, sir. I understand, and I understand what our burden is, but I also looking at the backdrop he had only been there until he started taking medical leave had been there for a relatively short time under Linda Bell. Most of these communications to him. I'd say 90% of them occurred while he was out on medical leave. So, she's asking him to and then deducting his and sending him letters that are sending him into more of a spiral because of his anxiety that causes him to have to be out additional time because of her letters to him. So, when you look at the totality, and not just to say well he didn't bring his truck back, or he didn't bring his keys back all of this is happening after she has already been writing him emails critical of him. And, you know, you talk about what Miss Madison, what point did your client disclose to the city. Even generally, the nature of his health problem. Have known that he was being upset by her writing him for the keys or whatever. Yeah, he did a five days before he was fired he submitted his FMLA forms, and there were facts to the city on either the fourth or the fifth of October, but all of that that came way after he left work, he'd been off work for several weeks. Yes, sir. He did not realize that he was going to have to be out as long as he was, and the original letter that was that was on nine by 2018 that's a document 63 dash one. And to say that he needed to be out of work, so he's out from nine five are going to give the reason that he had medical, while he had restrictions is what the medical provider, and you don't have to under the FMLA, you don't have to say what the reason is. And so he then submitted his medical letter letters, counsel counsel is that is that totally accurate because doesn't the statute require that if the employer asked you for a reason, or further information or documentation that you have to provide it. I thought that they could go and do their own evaluation of him. I'll tell you honestly, your honor I thought that they could go and do their own evaluation. I'm not aware that they could then have because they were calling his medical providers and asking his medical providers. She was about what the nature of his condition is. And I see that my time has expired. I just wanted to see. I feel like I'm expired. Okay, thank you, Miss Maddox we have your case, and it's under submission now and we'll move now to the third and final case for today.